895 A.2d 980

**Louis BURCH, et al.**

v.

**UNITED CABLE TELEVISION OF BALTIMORE
LIMITED PARTNERSHIP.**

**No. 62, Sept. Term, 2003.**

Court of Appeals of Maryland.

April 7, 2006.

Philip Friedman (Friedman Law Offices, PLLC, on brief), Washington, DC, for petitioner.

Jaime A. Bianchi (White & Case, LLP, Miami, FL, Ari Kodeck, Ned Kodeck, Chartered, Baltimore, on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

ELDRIDGE, J.

## I.

This case has a long history, having come before this Court on two prior occasions. *See Dua v. Comcast Cable of Maryland,* 370 Md. 604, 805 A.2d 1061 (2002); *United Cable v. Burch,* 354 Md. 658, 732 A.2d 887 (1999) ("*Burch I*"). Although a detailed factual and procedural history can be found in those cases, it would be useful to provide a brief summary here.

The case originated in 1995 as a class action suit brought by consumer television cable subscribers against their cable television provider, United Cable Television of Baltimore, L.P., now Comcast Cable, challenging the five dollar per month late fee that was being charged for cable bills that were not paid by the date set forth on the face of the bills. The subscribers alleged that the five dollar late fee was an illegal penalty and not a valid liquidated damages provision, and that, under Article III, § 57, of the Maryland Constitution, such late fees could not be charged in excess of six percent per annum without authorization from the General Assembly.[1] The Circuit Court for Baltimore City agreed. The court enjoined United Cable from collecting late fees in excess of $.50 per month after September 20, 1997, and entered a judgment in the amount of $6,701,50.60 against United Cable, which represented the late fees paid in excess of the limit from 1992

---

1. Article III, § 57, provides:

"The Legal Rate of Interest shall be *Six per cent per annum,* unless otherwise provided by the General Assembly."

through 1997.[2] United Cable appealed to the Court of Special Appeals, and this Court issued a writ of certiorari prior to any proceedings in the Court of Special Appeals. We held that United Cable could only charge the rate of interest allowed under Article III, § 57, of the Maryland Constitution, unless the General Assembly provided otherwise. *Burch I,* 354 Md. at 669, 732 A.2d at 893. At the time of the decision, the General Assembly had not enacted any legislation altering the interest rate which could be charged by cable television providers. Accordingly, under Article III, § 57, of the Constitution, the maximum late fee which could be charged by cable television providers was six percent per annum. *See Dua v. Comcast, supra,* 370 Md. at 611–613, 805 A.2d at 1066–1067.

In response to this Court's decision in *Burch I,* the General Assembly enacted Ch. 59 of the Acts of 2000, codified as Maryland Code (2000, 2002 Repl.Vol.), § 14–1315 of the Commercial Law Article, which became effective on October 1, 2000. The new statute increased the maximum allowable late fees that could be collected on consumer contracts involving the "sale, lease, or provision of goods or services which are for personal, family, or household purposes." The statute also contained a retroactive provision which purported to validate the late fees charged in excess of the constitutional limit on contracts entered into between November 1995 and October 1, 2000. *See* Ch. 59 of the Acts of 2000, § 5.

The retroactive provision of the statute, contained in § 5 of Ch. 59, was challenged in several actions by consumer subscribers of cable television against Comcast Cable of Maryland, Inc., the successor to United Cable. The suits had been brought in both the Circuit Court for Baltimore County and the Circuit Court for Harford County. The plaintiffs in those cases sought to recover the monthly late fees paid to Comcast in excess of the six percent per annum fee allowed under

---

**2.** The total judgment was in the amount of $7, 598,518.71, which included the late fees collected by United from November 7, 1992, through September 20, 1997, as well as prejudgment interest. *Burch 1,* 354 Md. at 666, 732 A.2d at 891.

Article III, § 57, of the Maryland Constitution. The cases were later consolidated in the Circuit Court for Baltimore County. Comcast moved to dismiss the actions on the ground that the retroactive provision in Ch. 59, § 5, validated the late fees which had exceeded the constitutional limit. The plaintiffs responded by arguing that the retroactive provision contained in § 5 of Ch. 59 violated their rights under both the federal and state constitutions. After a hearing on the matter, the Circuit Court granted Comcast's motion to dismiss, rejecting the plaintiff's constitutional arguments, and holding that the retroactive provision was valid. *See Dua,* 370 Md. at 614, 805 A.2d at 1067. The plaintiffs appealed to the Court of Special Appeals, and then filed in this Court a petition for a writ of certiorari which was granted. Thereafter, this Court reversed, holding that the retroactive provision contained in the statute violated Articles 19 and 24 of the Maryland Declaration of Rights and Article III, § 40, of the Maryland Constitution, and that, therefore, the retroactive provision was unenforceable. *Dua v. Comcast,* 370 Md. 604, 805 A.2d 1061. There was no challenge in that case to the prospective application of Ch. 59.

In September 2001, while the *Dua* case was pending in this Court, and in response to the enactment of Ch. 59, United Cable filed a motion in the Circuit Court for Baltimore City, requesting that the court vacate the permanent injunction entered in 1997, which continued to prohibit United Cable from collecting late fees in excess of $.50 per month. In its motion, United Cable argued that Ch. 59 substantially changed the law, and it requested the Circuit Court to vacate the permanent injunction so that United Cable could prospectively collect late fees in accordance with the new statutory provisions.

The *Burch* class of plaintiffs responded by requesting the court to abstain from vacating the permanent injunction until the Baltimore City Council had an opportunity to vote on a proposal which would have restricted cable television providers within the City limits from charging late fees in excess of $.50 per month. They also argued that, even if Baltimore

City's proposal was not enacted, the new law did not apply to the members of the *Burch* class of plaintiffs because the General Assembly intended to exempt that class. According to the plaintiffs, the exemption was contained in § 6 of Ch. 59, which provided that the new law would not apply to "any case for which a final judgment has been rendered and for which appeals have been exhausted prior to June 1, 2000." The plaintiffs further argued that, under § 4 of Ch. 59, the Circuit Court had jurisdiction to limit the late fees because the court qualified as a "federal, state, or local regulatory agency or authority," which was allowed under the statute to impose additional conditions or limitation on late fees. The plaintiffs asserted that the injunction constituted a valid regulation of late fees in Baltimore City.

Following a hearing on the matter, the Circuit Court granted United Cable's motion to vacate the permanent injunction, thereby allowing the cable company to collect future late fees in accordance with Ch. 59. The plaintiffs appealed to the Court of Special Appeals, which affirmed in an unreported opinion. The plaintiffs then filed in this Court a petition for a writ of certiorari which we granted. *Burch v. United Cable,* 377 Md. 111, 832 A.2d 204 (2003).

The plaintiffs, asserting that it was erroneous for the trial court to vacate the permanent injunction, reiterate the two arguments which they had made in the Circuit Court. First, the plaintiffs contend that the *Burch* class of plaintiffs was specifically exempt from the prospective application of Ch. 59 by the language of § 6. Second, the plaintiffs argue that the language of Ch. 59, § 4, allowing a "federal, state, or local regulatory agency" to impose additional limitations was applicable because the Circuit Court for Baltimore City qualified as such an "agency." Third, the plaintiffs maintain that the prospective application of Ch. 59 to the *Burch* class would be unconstitutional. They rely on Articles 8 and 24 of the Maryland Declaration of Rights, Article III, §§ 40 and 57 of the Maryland Constitution, and Article 1, Section 10, Clause 1, of the United States Constitution ("No State shall … pass any … Law impairing the Obligation of Contracts …").

United Cable disagrees with the plaintiffs' interpretation of Ch. 59, arguing that both the Circuit Court and the Court of Special Appeals correctly held that Ch. 59 prospectively applied to the *Burch* Class of plaintiffs. United Cable urges that this Court refuse to consider the plaintiffs' constitutional arguments, as no constitutional issue was raised in the Circuit Court, and the arguments were made for the first time on appeal to the Court of Special Appeals.

This Court shall reject the plaintiffs' arguments based on §§ 6 and 4 of Ch. 59, and shall affirm. We shall not decide the merits of the constitutional arguments because no constitutional issue was raised in the Circuit Court.

## II.

The plaintiffs acknowledge that United Cable "correctly contends" that no constitutional issue was raised in the Circuit Court; they "concede that this is true." (Petitioners' reply brief at 14). Nonetheless, they point out that Maryland Rule 8–131(a) gives an appellate court discretion to decide issues not raised at trial, and they request that this Court exercise its discretion to consider the merits of their constitutional arguments. As did the Court of Special Appeals, we shall deny the request.

Very recently we addressed this matter in *Baltimore Teachers Union v. Board of Education*, 379 Md. 192, 840 A.2d 728 (2004). In that case, the petitioner Union brought suit against the Board of Education requesting a declaratory judgment and injunctive relief on the ground that the Board lacked the statutory authority necessary to enter into contracts with private entities for the operation of public elementary schools. For the first time on appeal, the Union raised a constitutional issue under Article VIII, § 1, of the Maryland Constitution. This Court held that the failure of the Union to raise the constitutional issue in the trial court precluded it from raising the issue on appeal. We stated (379 Md. at 205–206, 840 A.2d at 736):

"Since the constitutional issue raised in the Union's brief was not raised in the trial court, we shall decline to address it. It is particularly important not to address a constitutional issue not raised in the trial court in light of the principle that a court will not unnecessarily decide a constitutional question. *Winder v. State,* 362 Md. 275, 306–307 n. 18, 765 A.2d 97, 114 n. 18 (2001); *Dorsey v. State,* 356 Md. 324, 342, 739 A.2d 41, 51 (1999)."

*See, e.g., Fitzgerald v. State,* 384 Md. 484, 505, 864 A.2d 1006, 1018 (2004) ("It is well-established and this Court has held consistently that we, in accordance with Rule 8–131, ordinarily will not consider any point or question not plainly raised or decided by the trial court"); *Livesay v. Baltimore,* 384 Md. 1, 18, 862 A.2d 33, 43 (2004) ("Because these issues were not raised below, we shall not consider them"); *Walker v. State,* 338 Md. 253, 262, 658 A.2d 239, 243 (1995) (Refusing to consider constitutional issues because "[t]here is nothing in the record before us to indicate that these issues were ever raised or decided below"); *County Council v. Offen,* 334 Md. 499, 508–511, 639 A.2d 1070, 1074–1076 (1994) (Holding that the Court of Special Appeals abused its discretion under Rule 8–131(a) by deciding an important issue of first impression in Maryland that had not been raised in the trial court); *In re John H.,* 293 Md. 295, 303, 443 A.2d 594, 598 (1982) (The Court declined to decide whether a statute was constitutional because the appellants "did not argue the issue of constitutionality to the trial judge").

■ As indicated above, "the Court's established policy is to decide constitutional issues only when necessary." *Mercy Hospital v. Jackson,* 306 Md. 556, 565, 510 A.2d 562, 566 (1986). Even when a constitutional issue is properly raised at trial and on appeal, or presented in a certiorari petition and the grant of the petition does not limit the issues, this Court will not reach the constitutional issue unless it is necessary to do so. *See, e.g., Wells v. Chevy Chase Bank,* 377 Md. 197, 205 n. 4, 832 A.2d 812, 817 n. 4 (2003); *McCarter v. State,* 363 Md. 705, 712–713, 770 A.2d 195, 199 (2001); *Baltimore Sun Co. v. Mayor & City Council of Baltimore,* 359 Md. 653, 659–660,

755 A.2d 1130, 1133–1134 (2000); *Harryman v. State,* 359 Md. 492, 503, 754 A.2d 1018, 1024 (2000); *Ashford v. State,* 358 Md. 552, 561–562, 750 A.2d 35, 39–40 (2000); *Thrower v. Bureau of Support Enforcement,* 358 Md. 146, 149, 747 A.2d 634, 636 (2000); *Professional Staff Nurses Assn. v. Dimensions Health Corp.,* 346 Md. 132, 138–140, 695 A.2d 158, 160–162 (1997); *Schochet v. State,* 320 Md. 714, 725–731, 580 A.2d 176, 181–185 (1990).

In light of this strong policy against reaching a constitutional issue unnecessarily, this Court has normally exercised its discretion to decide a constitutional issue, not raised below, only when the issue falls within a well-established exception to Rule 8–131(a), such as a jurisdictional matter. *See, e.g., Duffy v. Conaway,* 295 Md. 242, 254, 259–262, 455 A.2d 955, 963–965 (1983); *Shell Oil Co. v. Supervisor,* 276 Md. 36, 38–40, 343 A.2d 521, 522–524 (1975). *See also the discussions in County Council v. Offen, supra,* 334 Md. at 508–511, 639 A.2d at 1074–1076; *Moats v. City of Hagerstown,* 324 Md. 519, 524–526, 597 A.2d 972, 974 (1991).

The plaintiffs' constitutional arguments, raised for the first time on appeal, do not involve a jurisdictional question or any other matter which falls within an established exception to Maryland Rule 8–131(a). Consequently, we decline to consider the constitutional arguments.

III.

We shall now turn to the propriety of the Circuit Court's order vacating the injunction and the plaintiffs' arguments based on their interpretation of Ch. 59 of the Acts of 2000.

A.

Maryland circuit courts are authorized to grant, deny, modify or dissolve an injunction. Maryland Rule 15–502(b) and 15–202(f); *State Commission v. Talbot County,* 370 Md. 115, 127, 803 A.2d 527, 534 (2002). Moreover, the "finality" of a judgment containing a permanent injunction does not mean that the trial court, in a later separate proceeding, is

precluded from entering another judgment modifying or dissolving the injunction when circumstances have changed. This settled principle was explained by Judge Offutt for the Court in *Emergency Hospital v. Stevens*, 146 Md. 159, 166, 126 A. 101, 104 (1924):

"[The] contention assumes that the court granting the injunction had no power to rescind or modify its final decree after it had become enrolled, no matter what changes had occurred in the conditions or the relations of the parties after the decree. There is obviously no force in these contentions.

"Certainly, where changes in the relations of the parties or the conditions upon which it is based, occurring after a final decree of the nature of that passed in this case, render its further operation unreasonable, unjust, oppressive or inequitable, the court which passed it necessarily must have the right to dissolve it. . . . "

"It is true as a general principle that a final enrolled decree will not be opened to relitigate any question dealt with in it by the court passing such a decree, but that rule does not mean that, where events have occurred since the decree which would necessarily make the continuance of the injunction an absurdity, or unjust or oppressive, that the court which granted it could not in a proper proceeding change its decree to conform to the changed conditions. By way of illustration, if one were enjoined from obstructing a way appurtenant to land, and he afterwards acquired the land and its appurtenances, it cannot be supposed that the court which granted the injunction could not under such circumstances open the decree and dissolve it."

*See also Evans v. Stinchcomb*, 180 Md. 482, 485, 25 A.2d 444, 445 (1942) ("[A]n injunction . . . is . . . necessarily open to some change to meet intervening circumstances").

■ It is ordinarily an appropriate exercise of a circuit court's authority to vacate a permanent injunction when there are statutory changes which nullify the basis for the injunction. *See Chayt v. Maryland Jockey Club*, 179 Md. 390, 395,

18 A.2d 856, 859 (1941) (holding that the court properly lifted an injunction which restricted the building of a stable where a zoning ordinance had been amended subsequent to the imposition of the injunction). This is what the trial court did in the case at bar. Here, the Circuit Court vacated the permanent injunction entered in *Burch I* in response to the General Assembly's enactment of Ch. 59, which allowed cable providers to charge late fees in excess of those permitted when the permanent injunction was entered. Since Ch. 59 authorized late fees in excess of the previous six percent limit on all consumer contracts within the State of Maryland, the trial court complied with the new law by dissolving the injunction.

The plaintiffs, however, contend that the exception contained in § 6 of Ch. 59, which exempted cases in which a final judgment had previously been rendered and all appeals exhausted prior to June 1, 2000, protected both the money judgment and the permanent injunction from being modified.

Ch. 59 of the Acts of 2000, now § 14–1315 of the Commercial Law Article, sets forth the amount of late fees that can be assessed under consumer contracts, such as those for cable services. It states in pertinent part:

"§ 14–1315. Late fees.

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) 'Consumer contract' means a contract involving the sale, lease, or provision of goods or services which are for personal, family, or household purposes."

\* \* \*

(f) *Limitations.*—(1) A late fee included in a consumer contract pursuant to this section is subject to one of the following limitations:

(i) 1. The amount of the late fee may be up to $5 per month, or up to 10% per month of the payment amount that is past due, whichever is greater; and

2. No more than 3 monthly late fees may be imposed for any single payment amount that is past due, regardless of the period during which the payment remains past due; or

(ii) The amount of the late fee may be up to 1.5% per month of the payment amount that is past due.

(2) The amount of the late fee under paragraph (1) of this subsection shall be disclosed, in the consumer contract or by notice, in size equal to at least 10–point bold type.

(3)(i) Except as provided in subparagraph (ii) of this paragraph, a late fee included in a consumer contract pursuant to this section may not be imposed until 15 days after the date the bill was rendered for the goods or services provided.

(ii) If a bill is not rendered, a late fee included in a consumer contract pursuant to this section may not be imposed until 15 days after the payment amount becomes due.

(g) *Additional limitations or conditions.*—A late fee imposed under this section is subject to any additional limitations or conditions prescribed by any federal, State, or local regulatory agency or authority having jurisdiction over entities imposing late fees regulated by this section."

The argument that the *Burch* class of plaintiffs was intended to be excluded from the prospective application of the law, is based exclusively on § 6 of Ch. 59, a provision of the statute which is not codified. Section 6 states in pertinent part:

"[T]his Act shall apply to any case pending or filed on or after June 1, 2000, but may not be applied to any case for which a final judgment has been rendered and for which appeals have been exhausted prior to June 1, 2000."

The plaintiffs point out that they, or the class to which they belong, were plaintiffs in *Burch I,* that there was a "final" judgment, and that all appeals in *Burch I* had been exhausted prior to June 1, 2000. Accordingly, the plaintiffs' argument continues, Ch. 59, § 6, exempts them from the prospective application of the other provisions in Ch. 59. Therefore, the plaintiffs' conclude, the original permanent injunction, which

prohibited United Cable from collecting late fees in excess of the six percent constitutional limit from the *Burch* class, was a "final" judgment which should remain in place forever.

There can be little doubt that the General Assembly intended the increased late fees allowable under Ch. 59 to apply generally to all parties who enter into consumer contracts in Maryland. *See Dua v. Comcast,* 370 Md. at 612, 805 A.2d at 1066. As stated earlier, the statute was a direct response to this Court's decision in *Burch I,* which applied the Maryland Constitution's prohibition against late fees over the six percent limit without General Assembly allowance of such fees. 354 Md. at 681, 732 A.2d at 899. *See also* Fiscal Note to Senate Bill 145 and Fiscal Note to House Bill 251 of the 2000 legislative session of the General Assembly. The plain language of Ch. 59 sets forth no restrictions upon the prospective collection of such fees from Baltimore City residents in the *Burch* class. The General Assembly even went so far as to attempt to apply retroactively the increase to fees that were charged before the statute was enacted. *See Dua,* 370 Md. 604, 805 A.2d 1061. Although this Court struck down the retroactive provision of Ch. 59 in *Dua,* such an attempt by the General Assembly shows that it intended the law to be as broad as possible. 370 Md. at 620, 805 A.2d at 1070.

As the Court of Special Appeals correctly pointed out in its unreported opinion in the case at bar, what the exemption intended was for the monetary award in *Burch I* to remain intact, despite the attempted retroactive application of Ch. 59. Section 6 was not, as plaintiffs claim, an attempt to preclude the prospective application of the higher rates to the *Burch* class of plaintiffs.

 The plaintiffs' reliance upon the "final judgment" language of Ch. 59, § 6, as applied to the injunction portion of the *Burch I* judgment, is misplaced. The word "final" as used in statutes, rules, cases, and other legal writings, connotes somewhat different things, depending upon the context and

the circumstances.[3] For example, with respect to most judgments, including money judgments, after all appellate review has been exhausted and the litigation completely terminated, the word "final" connotes a judicial determination which can later be revised only under a few extremely limited circumstances. This is a type of judgment which, ordinarily, the General Assembly is constitutionally prohibited from overruling. *Baltimore v. Horn,* 26 Md. 194, 206 (1867).[4] By exempting the "final" money judgment in *Burch I* from the remaining provisions of Ch. 59, including the retroactive provision, the General Assembly obviously intended to avoid a constitutional problem under the separation of powers principle set forth in *Baltimore v. Horn, supra,* and other cases.

A "final" injunction, however, is in a wholly different category with respect to future revisions or modifications. As earlier discussed, "final" injunctions are generally subject to modification or dissolution when circumstances have changed. *Emergency Hospital v. Stevens, supra,* 146 Md. at 166, 126 A. at 103. Moreover, the General Assembly is entitled to change prospectively the underlying law upon which an earlier injunction was based, and such a change in the law may furnish an appropriate basis for a court to dissolve the injunction. *Chayt*

---

**3.** *See, e.g., General Motors Corporation v. Miller Buick, Inc.,* 56 Md.App. 374, 385, 467 A.2d 1064, 1069 (1983), where Judge Wilner for the court observed: "A 'final adjudication' can mean different things, and may occur at different times, depending upon the context in which the term is used...."

**4.** Under Article 8 of the Maryland Declaration of Rights and a long line of this Court's opinions, the General Assembly is ordinarily precluded from overturning a final judgment of the judiciary. The General Assembly, by so doing, would be

"exercis[ing] judicial power, which, by the Declaration of Rights, and numerous decisions in this State ..., it could not assume and exercise."

*Baltimore v. Horn, supra,* 26 Md. at 206. *See also Delmarva Power & Light Co. v. Public Service Commission of Maryland,* 371 Md. 356, 377–378, 809 A.2d 640, 652–653 (2002); *Wright v. Wright's Lessee,* 2 Md. 429, 452–453 (1852); *Miller v. The State,* 8 Gill 15, 19–150 (1849); *Prout v. Berry,* 2 Gill 147, 149 (1844); *Regents of the University of Maryland v. Williams,* 9 G & J 365, 410–411 (1838); *Berrett v. Oliver,* 7 G & J 191, 206(1835); *Crane v Meginnis,* 1 G & J 463, 475–477 (1829).

*v. Maryland Jockey Club, supra,* 179 Md. at 395, 18 A.2d at 859.

This distinction between most "final" judgments, including monetary judgments, and injunctions is well-settled and has existed for a long period of time. When the General Assembly enacted Ch. 59 of the Acts of 2000, it was presumably aware of the distinction. *See, e.g., Royal Plaza Community Association v. Bonds,* 389 Md. 187, 204, 884 A.2d 130, 141 (2005) (The Legislature "is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law," quoting *Mayor & City Council of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984) (internal quotation marks omitted)); *Collins v. State,* 383 Md. 684, 692–693, 861 A.2d 727, 732 (2004) (same); *Maryland Division of Labor and Industry v. Triangle,* 366 Md. 407, 422, 784 A.2d 534, 542 (2001) ("We presume that the General Assembly 'had, and acted with respect to, full knowledge and information as to prior and existing law . . . and the policy of the prior law,'" quoting *In re Special Investigation No. 236,* 295 Md. 573, 576, 458 A.2d 75, 76 (1983)); *National Asphalt v. Prince George's County,* 292 Md. 75, 79–80 and n. 4, 437 A.2d 651, 653–654 and n. 4 (1981) (The "'presumption of statutory construction that the Legislature acts with the knowledge of existing laws,'" coupled with the later statute's failure to mention the existing law, is an indication that the Legislature intended that the existing law remain viable).

In light of the presumption that the General Assembly knew that a "final" monetary judgment could not be modified by Ch. 59 and its retroactive provision, but that an injunction could later be judicially modified or dissolved based on a change in the law, it is reasonable to construe Ch. 59, § 6, as applicable only to the monetary portion of the *Burch I* judgment. It would not be reasonable to assume that the General Assembly intended that the *Burch I* injunction remain in place for the indefinite future, regardless of the prospective change in the law upon which the injunction was based. To ascribe such an intent to the General Assembly would require much more specific language than that contained in § 6 of Ch. 59.

Also militating against the plaintiffs' interpretation of Ch. 59, § 6, is "the principle that a court will, whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality." *Yangming Marine Transport v. Revon Products U.S.A., Inc.,* 311 Md. 496, 509, 536 A.2d 633, 640 (1988), and cases there cited. *See also, e.g., R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.,* 382 Md. 689, 718, 857 A.2d 1, 18 (2004) (same); *Edwards v. Corbin,* 379 Md. 278, 293, 841 A.2d 845, 854 (2004) ("This Court has consistently adhered to the principle that 'an interpretation which raises doubts as to a legislative enactment's constitutionality should be avoided if the language of the Act permits,'") quoting *Harryman v. State, supra,* 359 Md. at 509, 754 A.2d at 1028; *Nationsbank v. Stine,* 379 Md. 76, 86, 839 A.2d 727, 733 (2003) ("[T]his Court will prefer an interpretation [of a statute] that allows us to avoid reaching a constitutional question").

The plaintiffs' interpretation of Ch. 59, § 6, would result in discrimination presenting serious constitutional issues. As the plaintiffs concede, under their interpretation of Ch. 59, the law immediately prior to the effective date of Ch. 59 would only apply to late fees imposed on the plaintiffs by United Cable (now Comcast Cable) and not to late fees imposed by any other television provider (*e.g.,* a satellite television provider or a competing cable television provider) or by any other business which charges late fees to Baltimore City residents in accordance with consumer contracts. Furthermore, under the plaintiffs' interpretation, the pre-Ch. 59 law would not apply to any Maryland residents outside of Baltimore City, including those county residents who subscribe to Comcast Cable's television services. Finally, under the plaintiffs' theory, these discriminatory applications of the law prescribing maximum late fees would continue for the indefinite future, perhaps forever.

The plaintiffs' interpretation of Ch. 59 would create a small privileged group of consumers who would be legally protected, for the indefinite future, from paying the late fees that all other late-paying consumers in Maryland might have to pay.

This discrimination would clearly present significant constitutional issues under the equal protection component of Article 24 of the Maryland Declaration of Rights. *See Frankel v. Board of Regents,* 361 Md. 298, 316, 761 A.2d 324, 333 (2000) (" 'In areas of economic regulation, ... this Court has been particularly distrustful [, on equal protection grounds,] of classifications which are based ... on geography, *i.e.,* treating residents of one county or city differently from residents of the remainder of the State,' " quoting *Verzi v. Baltimore County,* 333 Md. 411, 423, 635 A.2d 967, 973 (1994)); *Maryland Aggregates v. State,* 337 Md. 658, 672 n. 9, 673, 655 A.2d 886, 893 n. 9, 894, *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995) ("[T]his Court has not hesitated to strike down discriminatory economic regulation that lacked any reasonable justification," and "has invalidated territorial classifications on equal protection grounds ... [which] imposed economic burdens, in a manner tending to favor residents of one county over residents of another"); *Kirsch v. Prince George's County,* 331 Md. 89, 626 A.2d 372, *cert. denied,* 510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993) (A statute which imposed more strenuous requirements on residential property rented to university students than on residential property rented to non-students was held to violate the equal protection component of Article 24); *Ocean City Taxpayers for Equal Rights, Inc. v. Mayor & City Council of Ocean City,* 280 Md. 585, 595, 375 A.2d 541, 547 (1977) (The Court invalidated, on equal protection grounds, "[t]he attempt by Ocean City to grant the voting franchise only to currently registered non-resident voters," which attempt constituted a " 'grandfather clause.' Such clauses have the effect of continuing a benefit upon those already receiving it while denying the benefit ... [to] the remainder of the class").

For all of the above-discussed reasons, therefore, we reject the plaintiffs' theory that Ch. 59, § 6, of the Acts of 2000, gave the plaintiffs a monetary benefit, for the indefinite future, which was not given to all other Marylanders.

## B.

Along with their contention that the *Burch* class should be protected from the application of the statute because of the exemption contained in section 6 of Ch. 59, the plaintiffs argue that the Circuit Court for Baltimore City qualifies as an "authority having jurisdiction over entities imposing late fees regulated by this section," and that the 1997 injunction qualifies as a limitation on late fees imposed by such regulatory authority. *See* § 14–1315(g) of the Commercial Law Article which provides:

"(g) *Additional limitations or conditions.*—A late fee imposed under this section is subject to any additional limitations or conditions prescribed by any federal, State, or local regulatory agency or authority having jurisdiction over entities imposing late fees regulated by this section."

Under the plaintiff's theory, a circuit court could regulate the late fees charged pursuant to any consumer contract governed by § 14–1315(g).

The plaintiffs' argument is frivolous. A Maryland circuit court is not a "regulatory agency or authority" over consumer contracts and has no jurisdiction to regulate initially the fees which businesses charge to consumers. Any attempt to confer such jurisdiction upon a court created by Article IV of the Maryland Constitution would be invalid under the separation of powers mandated by Article 8 of the Maryland Declaration of Rights. *See, e.g., Duffy v. Conaway, supra,* 295 Md. at 259–262, 455 A.2d at 963–965 (The imposition of a non-judicial function upon the judiciary violates Article 8 of the Maryland Declaration of Rights); *Department of Natural Resources v. Linchester,* 274 Md. 211, 225, 334 A.2d 514, 523 (1975); *Cromwell v. Jackson,* 188 Md. 8, 52 A.2d 79 (1947); *Close v. Southern Md. Agriculture Ass'n,* 134 Md. 629, 108 A. 209 (1919); *City of Baltimore v. Bonaparte,* 93 Md. 156, 48 A. 735 (1901).

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS.*